IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 4:17CR218CDP/SPM ) |
| MICHAEL HOLLOMAN | ) ) |
| Defendant. | ) |

### POST HEARING BRIEF IN SUPPORT OF PRETRIAL MOTION TO SUPPRESS EVIDENCE AND STATEMENTS

Defendant MICHAEL HOLLOMAN, through his attorney, Melissa K. Goymerac, Assistant Federal Public Defender, states the following in support of his Motion to Suppress Evidence and Statements.  Docs. # 23.  Mr. Holloman hereby incorporates by reference and does not waive any of the allegations of fact or legal arguments included in his previously filed Motions.  In further support Mr. Holloman states the following:

### *Introduction:*

1. On August 18, 2017, counsel for Mr. Holloman filed a Motion to Suppress Evidence and Statements.  Doc. # 23.

2. On September 7, 2017, the Court conducted a hearing on the Motion; testimony was heard and exhibits were presented.  On September 22, 2017, a follow-up hearing was conducted; testimony was heard and an exhibit was presented.

3. Mr. Holloman's Motion seeks to suppress evidence taken from an apartment/loft in a building located at 1023 Spruce Street in the City of St. Louis, specifically a black and silver firearm.

1

4. The government's evidence failed to establish that the firearm seized by the St. Louis Police from the apartment/loft and his statements related thereto are untainted by his unlawful arrest. *United States v. Phillips,* 540 F.2d 319, 325 – 26 (8th Cir. 1976) (When an illegal search has come to light, the government has the ultimate burden of persuasion to show that its evidence is untainted). Furthermore, the government's evidence fails to reliably establish that Mr. Holloman's alleged consent to search the apartment/loft was voluntary. Therefore, the firearm and any statements made by Mr. Holloman in relation thereto should be suppressed.

## Facts

5. On October 11, 2016, Detective Kelli Swinton of the St. Louis Metropolitan Police Department's Sex Crimes Unit received information regarding a student victim from a Public School Resource Officer. Transcript of Evidentiary Hearing September 22, 2017 ("Tr. 2") at 5. She immediately went to the school to conduct interviews. *Id.* The student alleged that on the day of the Homecoming dance, October 1, 2016, she had sexual contact with Mr. Holloman at the Hyatt hotel in downtown St. Louis. Tr. 2 at 8.

6. After interviewing the principal of the school, observing an interview of the student in the presence of her mother, and after a forensic interview of the student was conducted on an unknown date thereafter, Detective Swinton had the following information by October 29, 2016:[1]

- Mr. Holloman worked for the YMCA which had contract with the school for him to teach weightlifting classes. Tr. 2 at 9.

- A female student who was under 17 years old said she had contact with him at school, over the phone, and on Facebook. The female student was able to identify Mr. Holloman by name and by his Facebook page.

---

[1] It is possible that in addition to the information listed, the detective may have observed Mr. Holloman on a surveillance tape at the Hyatt hotel on the 18th floor on the night of Homecoming, before October 29, 2016, but she is not sure. Tr. 2 at 28 & 34.

2

- The female student accused Mr. Holloman of touching her in appropriately at school, said that they had an unspoken attraction, and alleged that she had sexual contact with him on October 1, 2016, in a room on the 18th floor of the Hyatt hotel located in downtown St. Louis.  She said that on that evening (which was Homecoming) he had contacted her via Facebook and she met him outside the hotel and then walked with him to his room inside the hotel. Tr. 2 at 9 – 11.

- The student's friend told police that the student had left a room at the hotel they were sharing on the night of Homecoming at a time consistent with the student's report of meeting Mr. Holloman.  The student's mother told police that Mr. Holloman either called their house or there was an unusual number that called their house (although the detective never verified the number).  However, no witness saw any contact between the student and Mr. Holloman. Tr. 2 at 31 - 32.

- At first, when the student was asked about Mr. Holloman she denied that anything inappropriate had happened with him.  However, later, she recanted her denial.  Tr. 2 at 22.

- The student was examined at the hospital but no relevant information came out of that visit.  Tr. 2 at 23.

- Although Mr. Holloman had a Facebook account, the student deleted all of the Facebook contact she allegedly had with Mr. Holloman and Detective Swinton could not verify that any such contact had occurred.  Tr. 2 at 27 & 29.

7. After Detective Swinton subpoenaed and received Mr. Holloman's YMCA employment records which contained a phone number and a Fairview Heights Illinois home address.  She called the phone number listed in the YMCA records and left messages asking him to speak with her but he never responded.  The detective thinks she might have spoken to him and that he refused to speak with her about the investigation, but she was not sure if she ever spoke to him (or ostensibly if he ever received any of her messages).  Tr. 2 at 24.

8. On October 29, 2016, at 1:02 am, Detective Swinton entered a "wanted" for Mr. Holloman on the charge of statutory rape in the second degree into a statewide law enforcement computer system (REJIS) with his pedigree information and her contact information.  Tr. 2 at 15 – 16, & 38.

9. According to Detective Swinton, she believed her primary probable cause to place the "wanted" for Mr. Holloman as of October 29, 2016, was the student's statement.  Tr. 2 at 32.  Although it would

have been her preference to speak with Mr. Holloman before-hand (to give him an opportunity to provide exculpatory evidence or "ideally" to get a confession) Detective Swinton made her own determination that there was sufficient for probable cause to arrest Mr. Holloman when she placed the "wanted" in the REJIS system.  Tr. 2 at 35, & 41 - 42.  After the "wanted" was placed, follow-up investigation occurred, however, the exact nature of and results of that investigation is unclear from the present record.  Tr. 2 at 32 & 28.

10. Six months later, in April, 2017, Bradford Ellis, a detective with the St. Louis Metropolitan Police Department for 11 years, received a tip from a confidential informant.  Transcript of Evidentiary Hearing September 7, 2017 ("Tr. 1") at 5 – 6, & 43.  Detective Ellis was assigned to investigate narcotics cases as well as subjects who were convicted felons with guns. *Id.*

11. The un-named informant told Detective Ellis that Michael Holloman was a convicted felon "known to be in possession of a firearm." Tr. 1 at 6, 25, 26 – 27, & 35.  The informant provided the detective with a description of Mr. Holloman's tattoos, skin color, and date of birth as well as the location where Mr. Holloman was staying.  Tr. 1 at 1, 6, 8, & 25.  Sometime later the informant identified a photograph of Mr. Holloman that the detective had secured during his follow-up investigation.  Tr. 1 at 7 & 28.

12. Using various law enforcement data-bases, Detective Ellis discovered that Mr. Holloman had prior felony convictions and was "wanted" for statutory rape second degree by the St. Louis Metropolitan Police Department's Sex Crimes Unit. Tr. 1 at 8 & 40.  The "wanted" was not a warrant signed by a judge based on probable cause.  Tr. 1 at 41 – 42.

13. At some point before April 20, 2017, Detective Ellis contacted Detective Swinton and asked if her case was still open and if she was still looking for Mr. Holloman regarding the statutory rape second degree offense.  Tr. 2 at 36 & 44 – 45.  She informed him she was, but did not share any of the details of

4

her investigation with Detective Ellis and there is no evidence in the record that he ever accessed her reports regarding the accusation.  *Id.*  Furthermore, there was nothing in Detective Swinton's investigation that related to firearms and Mr. Holloman.  Tr. 2 at 37 – 38.

14. On April 20, 2017, Detective Ellis, his partner, and another detective set up surveillance in their covert car at 1023 Spruce Street in St. Louis which is the address of Cupples Station Loft Apartments where the confidential informant had said Mr. Holloman was staying.  Tr. 1 at 8, 9, 25, & 29.

15. At approximately 4:30 pm, the detectives saw Mr. Holloman walking up the sidewalk towards the front door of 1023 Spruce Street.  Detective Ellis immediately ran up to Mr. Holloman, ordered him to the ground, placed him in handcuffs, took him back to the police car, and put him in the car while he was handcuffed.  Tr. 1 at 9, 29 & 49.  The detective arrested Mr. Holloman due to the aforementioned "wanted" issued by the St. Louis Metropolitan Police Department's Sex Crimes Unit.  Tr. 1 at 29 & 48 - 49.

16. A search incident to his arrest revealed no weapon, drugs, or any contraband.  Tr. 1 at 31-32.  Detective Ellis testified at the hearing that he read Mr. Holloman the *Miranda* rights before he placed him in the covert vehicle but acknowledged that he forgot to put anything about this in his police report.  Tr. 1 at 30, 31, & 42.

17. By the time Mr. Holloman was placed in the police car, an unidentified sergeant had arrived and witnessed Detective Ellis stating the *Miranda* rights to Mr. Holloman.  Tr. 1 at 31 & 42. *See also* page 35 (Detective Ellis identifies the police officers present during this encounter as himself, his sergeant, Detective Frye, and Detective Thacker).

18. Detective Ellis did not take Mr. Holloman immediately to the St. Louis Metropolitan Police Department located a few blocks away so that the district which originally requested the "wanted" could be responsible for immediately conducting any follow-up interview or investigation regarding the

5

offense for which Detective Ellis allegedly made the arrest.² Tr. at 50.  Detective Ellis agreed that when a "wanted" person is located, the police officer who located him or her is supposed to apprehend him or her and call the detective that is in charge of the "wanted" and then allow that detective to respond to where the individual is taken in order to talk to him or her.³  Tr. 1 at 21.   Instead, the detective left Mr. Holloman in the police car, handcuffed and surrounded by four law enforcement officers for approximately five minutes.  Tr. 1 at 31.

19. Thereafter, Detective Ellis went inside the car and began to ask Mr. Holloman about his possession of firearms.  Tr. 1 at 10 – 11, & 33.  The detective asked for permission to search the apartment in the building where Mr. Holloman said he was going to take a shower and change clothes before going to his son's baseball game.  Tr. 1 at 12.  Mr. Holloman said he did not have anything illegal in the apartment and did not consent to any search.  Tr. 1 at 33 & 45 L.5.  However, the detective, while two other detectives and a sergeant stood nearby, kept talking to Mr. Holloman and repeating "over and over again" that he "shouldn't have a problem with us going upstairs."  Tr. 1 at 45.  Although Detective Ellis has recording ability on his cell phone and inside the covert police car, he did not record this encounter. Tr. 1 at 34.

20. Eventually, Mr. Holloman and the detectives and sergeant went up to the apartment/loft.  Mr. Holloman did not have a key to front door of the building which was locked; however, "at that time somebody was coming out and [the detectives, the sergeant, and Mr. Holloman] just went in."  Tr.1 at 32.

---

² It should be noted that Metropolitan Police Department – City of St. Louis, Office of the Chief of Police Special Order No. Section XI of SO 8-01 – requires that when a person is detained based on a "wanted" the district that originally requested the "wanted" is responsible for "**immediately**" conducting an investigation take any follow-up action.  *See* Post Hearing Brief Exhibit A.  Emphasis supplied.

³ According to the St. Louis Metropolitan Police Department's web site, the Sex Crimes Unit is located at Police Headquarters, 1915 Olive Street, St. Louis, MO 63103.
Located at: http://www.slmpd.org/sex_crimes.shtml.

6

21. When the four police officials arrived inside one of the apartment/lofts for which Mr. Holloman had a key, Detective Ellis handed Mr. Holloman a consent form.  Tr. 1 at 13 & 36.  Mr. Holloman signed the consent form. Government's Exhibit #1.  Although the Detective guessed that it was signed at approximately 4:45 pm, the time on the form states 4:00 pm. *Compare* Tr. 1, at 36 and at 14. When asked by the Court what time the form was signed, Detective Ellis testified that it was signed at 4:00 pm. Tr. 1 at 37 - 38.

22. Furthermore, the address on the form does not specifically identify the apartment/loft that Mr. Holloman was allegedly consenting to be searched; only the outside building address is on the form. Government's Exhibit #1 (states "1023 Spruce" and "Loft: Kitchen and Living areas" but does not indicate which apartment/loft to which the consent referred).

23. While in the apartment/loft, the detectives located a firearm on top of the refrigerator.  Tr. 1 at 17.  Mr. Holloman was arrested for possessing the weapon.  Tr. 1 at 42.

24. After he was arrested, Mr. Holloman was taken to the Justice Center, booked, and interrogated - during which he made admissions about the firearm.  Tr. 1 at 21 – 23.

25. The following day, on April 21, 2017, Mr. Holloman was conveyed to Police Headquarters and questioned regarding the allegations of statutory rape after which a probable cause statement was prepared by Detective Swinton and a warrant for his arrest was issued by a Judge on that same date.  *See* Post Hearing Brief Exhibit B.

## Legal Argument

### *Probable Cause to Arrest*

26. In *United States v. Hensley,* the Supreme Court held that reliance on a flyer or bulletin, issued on the basis of articulable facts supporting a reasonable suspicion that a "wanted" person has committed an offense, justifies a *Terry*-type stop. *United States v. Hensley,* 469 U.S. 221, 230-33 (1985).  If a

7

"wanted" is based on reasonable suspicion, a detaining officer need not personally know the facts giving rise to that suspicion as long as the officer who disseminated the "wanted" had a reasonable suspicion which would allow him or her to have made the stop. *Henlsey* at 231. In such a case, the stop or detention made based on a "wanted" may not be any more intrusive than would have been permitted by the officer who disseminated the "wanted" in the first place. *Hensley* at 232 (e.g a detention to ascertain identity, conduct a pat down search for officer safety, and acquire more information by questioning a suspect); *See also United States v. Farnell,* 701 Fed. 3d 256, 262 (A flyer or bulletin based on reasonable suspicion "justifies a stop to check identification, to pose questions to the person, or to detain the person briefly while attempting to obtain further information"). *Hensley* and *Farnell* address a *Terry* stop situation and not a full on arrest based on a police officer's assessment of probable cause to arrest.

27. When multiple officers are involved in an investigation, probable cause to arrest a subject without a warrant may be based on their collective knowledge. An officer may arrest a subject without all the information about a particular investigation as long as there is some degree of communication and information shared between him or her and the investigating officers who have information that supports probable cause to arrest. *United States v. Robinson,* 664 F.3d 701, 703 (8th Cir. 2011). The requirement of "some degree of communication" creates a distinction between, on the one hand an investigative "team," and on the other hand, "officers acting as *independent actors who merely happen to be investigating the same subject*." *Id.* at 704. Emphasis added. In the former case there is no requirement that *all* the relevant collective knowledge of the team be communicated to the officer who made the stop, arrest, or search at issue. *Id.* There need only be some communication related to the substance of the investigation. *Id.* at 703 (An investigative "team" includes a patrol officer in uniform who was asked by a detective to pull over three or four males in a vehicle that the detective was at that time investigating for firearms, traffic violations, and theft and the detective followed the patrol officer until

8

the vehicle was stopped). *See also United States v. Chavez,* 534 F.3d, 1338, 1341 & 1346 (10th Cir. 2008) (DEA agents and Task Force Officer who were conducting under-cover operation recruit patrolman to perform traffic stop and share aspects of their investigation that are pertinent to the probable cause inquiry – constitutes "vertical collective knowledge" sufficient to comply with Fourth Amendment requirements).

28. In the present case, Detective Swinton, the officer who alleged there was probable cause to arrest Mr. Holloman based on her investigation when she issued the "wanted,"[4] did not share any of the details of her investigation with Detective Ellis, who ultimately arrested him. Tr. 2 at 36 & 44 – 45. She assumed that informing Detective Ellis the nature of the charge she contemplated against Mr. Holloman (statutory rape) was sufficient. *Id.*

29. Furthermore, it is highly questionable that the information Detective Swinton had developed on the day she issued the "wanted" (October 29, 2016) was sufficient to support a constitutional finding of probable cause. The probable cause standard for arrest is facts and circumstances that are "sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense." *Gerstein v. Pugh,* 420 U.S. 140, 111 (1975). The standards applicable to the factual basis supporting an officer's probable cause assessment "are at least as stringent as the standards applied with respect to the magistrate's assessment." *Whiteley v. Warden, Wyoming State Penitentiary*, 401 U.S. 560, 566 (1971).

30. The record before this Court establishes that on the date she issued the "wanted" for Mr. Holloman, Detective Swinton had a complaint by a student against him for having touched her

---

[4] Problems with a statewide "wanted" system that permits police officers, instead of independent judges, to make probable cause to arrest determinations is fraught with dangers as pointed out by the Department of Justice in its Investigation of the Ferguson Police Department, March 4, 2015 (filed as Doc. # 1-9 in Case No. 4:16CV254 JAR). While these wanteds "are supposed to be based on probable cause, [referencing Ferguson Special Order regarding posting a wanted in the statewide system], they operate as an end-run around the judicial system." Department of Justice Report at 22. The Report notes the constitutional risks inherent in this kind of system. *Id.* at 22 – 23.

9

inappropriately at school and having sexual contact with her in a hotel room during Homecoming at the Hyatt hotel in St. Louis.  Tr. 2 at 5 - 11.The accusation was brought to the attention of the police ten days after it occurred. *Id.*  The student denied the allegation when first asked about it days earlier.  Tr. 2 at 22.  The record does not conclusively establish that Detective Swinton had any corroboration of the student's accusation other than the student correctly identified Mr. Holloman as an instructor at the school and that her friend, who shared a hotel room with her on the night of the Homecoming, said the student left the room for a period of time when the student said she was with Mr. Holloman.  Tr. 2 at 31 – 32.  The record does not support that the Detective had verified that Mr. Holloman was present on October 1, 2016 at the Hyatt hotel, that there was any Facebook or phone contact between the student and Mr. Holloman, that any witness had ever seen the two together, or that Mr. Holloman actually received any of the Detective's phone messages inquiring if he would speak to her about the accusation.

31. Therefore, as of October 29, 2017, when the "wanted" was put out by Detective Swinton, she did not have facts sufficient to warrant a prudent man in believing that Michael Holloman had committed a statutory rape of the student in question.  It was not until she developed further facts, *after* October 29, 2016, and interviewed Mr. Holloman on April 21, 2017 that the Detective was able to secure a finding by a Judge that sufficient probable cause existed to arrest him for the offense.  *See* Post Hearing Brief Exhibit B.

32. Additionally, Detective Ellis did not have probable cause to arrest Mr. Holloman based on his investigation relating to a weapons offense.  All he had was what he described as a "tip" from an informant that Mr. Holloman was "known to be in possession of a firearm."  Tr. 1 at 5 – 6 & 43.  The record does not confirm that this informant was in any way reliable, had provided accurate information about crimes in the past, or was aware of anything other than vague reputation information about Mr.

Holloman possessing a weapon.  He did not witness Mr. Holloman to commit any crime on April 20, 2017 and not find a weapon, drugs, or anything illegal on Mr. Holloman when he was arrested that day.

33. Instead of a brief investigatory detention based on the "wanted" or the "tip" he had received from the informant, Detective Ellis readily agrees that he ordered Mr. Holloman to the ground, handcuffed him, and took him into custody – he arrested him.  Tr. 1 at 9, 29, & 49.

34. Mr. Holloman's arrest was unlawful.  At most Detective Ellis had reasonable suspicion to detain Mr. Holloman briefly on April 20, 2017, to confirm his identity, determine if he was carrying a weapon, and contact Detective Swinton to ascertain if at that time she wanted to detain him to complete her statutory rape investigation.  However, since Detective Ellis did not witness Mr. Holloman commit any crime and had not received communication related to the substance of Detective Swinton's investigation (either the facts she knew on October 29, 2016 when the "wanted" was issued or the facts she may have developed between October 29, 2016 and April 20, 2017) he did not have sufficient probable cause to arrest Mr. Holloman.  *Compare United States v. Coleman,* 2014 WL 4071976 (E.D. MO Aug. 18, 2014) (Detective informs patrol officers of suspect's presence in area and asks them to intercept her because she is driving with a suspended license, there is a warrant for her arrest from Indiana, and she is "up to no good."  When detained by the officers they witnessed that she is driving without a license, and they independently smelled burnt marijuana emanating from the car she was driving when they first approached.  These facts provided sufficient probable cause to arrest her and search the vehicle for marijuana wherein a weapon was located).

### *Voluntariness of Consent to Search:*

35. The Fourth Amendment ordinarily prohibits the warrantless entry of a person's dwelling as unreasonable *per se*; however, one carefully drawn exception recognizes that a person may voluntarily consent to such a search.  *Georgia v. Randolph,* 547 U.S. 103, 109 (2006) (citations omitted).  The

11

government bears the burden of establishing voluntary consent. *Schneckloth v. Bustamonte,* 412 U.S. 218, 222 (1973); *Bumper v. North Carolina,* 391 U.S. 543, 548 – 49 (1968). It is left to the Court to determine the credibility of witnesses regarding whether consent was voluntarily given. *United States v. Thompson,* 45 Fed. Appx. 563 (8th Cir. 2002).

36. The Eighth Circuit uses a five factor test to analyze the individual characteristics of the person allegedly giving consent (age, prior contact with law enforcement, intoxication, etc…). However, these factors must be considered in conjunction with a six-factor test that looks at the environment in which the individual allegedly gave consent. *United States v. Hathcock,* 103 F.3d 715, 719-20 (8th Cir. 1997). The six factor test includes: "(1) the period of time the individual was detained or questioned; (2) whether the police threatened, physically intimidated, or punished the individual; (3) whether the police made promises or misrepresentations, on which the individual relied; (4) whether the individual was in custody or under arrest at the time consent was given; (5) whether the consent occurred in a public or secluded place; and (6) whether the individual stood by silently while the search occurred." *Id.* at 719 – 20.

37. The weight of the evidence in this case casts doubt on the accuracy of Detective Ellis' testimony regarding the circumstances of the consent allegedly given by Mr. Holloman and the record evidence renders unreliable any determination that the consent was voluntary. First, the record provides only conflicting testimony regarding when Mr. Holloman allegedly signed the consent form – on numerous occasions Detective Ellis insisted that Mr. Holloman signed the form at 4:00 pm as is written on the form, which according to his testimony would be before the Detective even encountered him. Government's Exhibit #1; Tr. 1 at 14, 36 – 38. Furthermore, the form does not identify the exact apartment/loft that Mr. Holloman allegedly consented to be searched – only the building where the apartment/loft is located. Government's Exhibit #1.

38. Second, with regards to the factors the Court is to consider regarding the environment under which this consent was given, Mr. Holloman was under arrest and surrounded by four police officers in a small kitchen when he signed the consent form. Tr. 1 at 13 & 36. Before he even agreed to go with the police to the apartment/loft, he was "talked to" while confined in a car and handcuffed with one officer inside and three standing outside. Tr. 1 at 45. Detective Ellis kept telling Mr. Holloman "over and over" that he "**shouldn't** have a problem" with the police going to the apartment/loft. *Id.* Emphasis supplied. Mr. Holloman's consent was compliance with a police demand which is not voluntary consent. *See e.g. United States v. Morgan,* 270 F.3d 625, 631 (8th Cir. 2001) (abrogated on other grounds by *Rodriguez v. United* States, 135 S. Ct. 1609 (2015) (Detention of a van awaiting drug sniffing dog – defendant did not voluntarily consent to a search of the van under the circumstances when she said "go ahead").

### *Fruit of the Poisonous Tree:*

44.   The Supreme Court has explained that the overriding issue in fruit of the poisonous tree cases "is whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States,* 371 U.S. 471, 488 (1963) (internal quotation marks omitted). The exclusionary rule bars the admission of physical evidence and witness testimony obtained directly or indirectly through the exploitation of police illegality. The burden of showing admissibility, once the illegality is raised, rests on the prosecution. *See Taylor v. Alabama,* 457 U.S. 687, 690 (1982).

45.   The illegal arrest of Mr. Holloman was not attenuated from the consent to search. Mr. Holloman's consent to search was not voluntary because it followed from his illegal arrest and no intervening events purged the taint of his illegal arrest. *United States v. Reinholz,* 245 F.3d 765, 781 (8th

13

Cir. 2001) (Under totality of circumstances consent that followed from illegal arrest should be excluded because no intervening event purged the taint of the illegal arrest).

46. Likewise, any statements made by Mr. Holloman following his illegal arrest were made during and shortly after his illegal arrest and were not rendered admissible simply because he had been given *Miranda* warnings prior to making statements. While a confession may be 'voluntary' for purposes of the Fifth Amendment, the voluntariness is not sufficient to purge the taint of an illegal arrest. *Taylor* at 690. A confession made less than two hours after an illegal arrest is not sufficient to purge the taint. *See Brown v. Illinois,* 422 U.S. 590, 604 (1975); *Taylor,* 457 at 691 (six hours not sufficient).

BY REASON OF THE FOREGOING, this Court should enter an order granting defendant's Motion to Suppress Evidence and Statements.

Respectfully submitted,

/s/ Melissa K. Goymerac
MELISSA K. GOYMERAC
Assistant Federal Public Defender
1010 Market Street, Suite 200
St. Louis, Missouri 63101
Telephone: (314) 241-1255
Fax: (314) 421-3177
E-mail: Melissa_Goymerac@fd.org

**CERTIFICATE OF SERVICE**

I hereby certify that on October 12, 2017, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon Rodney Holmes, Assistant United States Attorney.

/s/ Melissa K. Goymerac
MELISSA K. GOYMERAC
Assistant Federal Public Defender