UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:17CR218CDP(SPM) |
| | ) | |
| MICHAEL HOLLOMAN | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

In accordance with the Memorandum filed herein,

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Evidence and Statements (Doc. 23) be **GRANTED.**

The parties are advised that they have **fourteen (14)** days in which to file written objections to this report and recommendation pursuant to 28 U.S.C. §636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  *See Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).

Trial in this case will be set at a later date before the **Honorable Catherine D. Perry.**

_____
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 9th day of November, 2017.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:17CR218CDP(SPM) |
| | ) | |
| MICHAEL HOLLOMAN | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## **MEMORANDUM**

This matter was referred to the undersigned United States Magistrate Judge for all pretrial matters pursuant to 28 U.S.C. § 636(b). Defendant Michael Holloman is charged in an indictment with one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g). The charges stem from Holloman's warrantless arrest on April 20, 2017, and a subsequent search of his girlfriend's nearby apartment, which resulted in officers' seizure of a handgun from the kitchen of the apartment.

Holloman filed a motion to suppress evidence and statements challenging the constitutionality of his arrest and the search of his girlfriend's apartment. (Doc. 23). Specifically, Holloman contended his arrest violated the Fourth Amendment because it was based solely on a "wanted" bulletin issued by someone other than the arresting officer. Holloman also challenged the search on grounds that it was conducted without a warrant and without valid consent. Holloman contends that any statements and evidence arising from his arrest and the subsequent search must be suppressed as the fruits of the illegal arrest and search.

The undersigned held an evidentiary hearing on September 7, 2017. The United States presented the testimony of St. Louis Metropolitan Police Department Detective Bradford Ellis. The United States also offered two exhibits into evidence which included a consent-to-search form and an audio recording of Holloman's statement. Defense counsel questioned the United States' witness but did not offer any additional testimony or evidence. After hearing oral arguments from counsel, the undersigned continued the hearing so that the parties could supplement the record with additional evidence, including evidence regarding the "wanted" bulletin and the facts and circumstances surrounding its issuance.

The evidentiary hearing continued on September 22, 2017. At the time of the supplemental hearing, the United States presented a copy of the "wanted" bulletin, *see* Govt. Ex. 3, and testimony by Detective Kelli Swinton, who testified about the events leading up to the issuance of the "wanted" bulletin. At the close of the hearing, counsel requested, and were granted, time to file post-hearing briefs after a transcript of the hearing was filed. Post-hearing briefing concluded on October 18, 2017, and the matter is now ready for a ruling.

Based on the evidence presented at the evidentiary hearing and the written submissions of the parties, I make the following findings of fact and conclusions of law.

## I.  FACTUAL FINDINGS

### A.  OCTOBER 2016 STATUTORY RAPE INVESTIGATION OF HOLLOMAN

On October 11, 2016, St. Louis Metropolitan Police Detective Kelli Swinton ("Det. Swinton") was working as a Child Abuse Detective when a School Resource Officer contacted her to report alleged sexual abuse by a teacher at a school. Det. Swinton responded to the school and interviewed the principal of the school and the victim's mother. Det. Swinton also

participated in an interview of the victim, who was a minor. On October 17, 2016, Det. Swinton conducted or participated in a more detailed recorded forensic interview of the victim.

Det. Swinton's initial and forensic interviews revealed that Defendant Michael Holloman, who was employed by the YMCA at the time, was assigned by the YMCA to teach weightlifting at an alternative school where the victim was a student. The victim met Holloman at the school and reported that there was an attraction between herself and Holloman. Their relationship progressed with the pair communicating via telephone and Facebook Messenger. During a homecoming dance that took place on or about October 1st or 2nd of 2016, the victim and Holloman reportedly had sexual contact in Holloman's hotel room. The victim initially denied that she had sexual contact with Holloman but later recanted that denial.

Following the foregoing interviews, Det. Swinton attempted, unsuccessfully, to obtain a criminal history of Holloman. Det. Swinton was unable to verify the reported sexual contact via any physical or DNA evidence. Because the victim deleted all of the relevant content from her account, Det. Swinton was unable to verify the reported Facebook Messenger contact. Det. Swinton verified that Holloman had a Facebook account; however, she found no evidence to corroborate contact between the victim and Holloman. Det. Swinton reviewed the hotel's surveillance video and believed that it confirmed Holloman's presence at the hotel on the night of the homecoming dance. However, none of the video footage showed Holloman with the victim. A witness who attended the dance confirmed that the victim was absent during the time of the alleged sexual encounter, but neither the witness nor any other eyewitness saw Holloman at the hotel or otherwise saw Holloman and the victim together.

Det. Swinton subpoenaed Holloman's employment records from the YMCA and used that information to attempt to contact him for an interview. She left him messages and may have

spoken to him on one occasion, but he never voluntarily came in to be interviewed. After unsuccessfully attempting to interview Holloman, on October 29, 2016, Det. Swinton entered Holloman's information into a police database as "wanted" so that other police officers who might encounter Holloman in the State of Missouri would take him into custody to be interviewed.

As it was explained at the evidentiary hearing, "[a] wanted is basically what detectives put out for an individual who is suspected of doing a crime." *See* Evid. Hrng. Tr. I (Doc. 31), p. 19. An officer who wants to enter a "wanted" into the police database must get the approval of his or her sergeant before entering the "wanted." *Id.* at p. 20. When St. Louis Metropolitan Police see a "wanted" in the computer as being active, they are supposed to "apprehend the subject," take the arrestee to the police station, and call the detective who entered the "wanted" so that the officer who issued the "wanted" can question the person at whatever police station the person is taken to. *Id.* at pp. 20-21. *See also* Evid. Hrng. Tr. II (Doc. 36), p. 13.

Det. Swinton testified that a suspect interview is typically "the final stage" of a sex crimes investigation. *Id.* at p. 11. In Holloman's case, she "placed him 'wanted'" toward the end of her investigation because she had been unable to conduct a voluntary "suspect interview." *See id.* at pp. 11-12. Although she could have noted "do not detain" when she entered the "wanted," Det. Swinton did not do so. Thus, as entered, the "wanted" bulletin signaled to other police that Holloman should be detained for questioning in connection with suspected statutory rape second. The "wanted" bulletin provided Holloman's name, date of birth, height, weight, and other personal identifiers, including the presence of tattoos. It indicated that he lived at an address in Fairview Heights, Illinois. It did not indicate that Holloman was armed and/or dangerous. *See* Govt. Ex. 3.

4

After entry of the "wanted" on October 29th, Det. Swinton's investigation remained open. Although she testified that she believed she had probable cause for a warrant as of October 29, 2016, Det. Swinton did not present the case to a Circuit Attorney or otherwise attempt to obtain a warrant until after Holloman was taken into custody on April 20, 2017. Det. Swinton's explanation for not seeking a warrant was that she considered it be a "best practice" to interview a suspect before seeking a warrant: "[I]deally as an investigator, I would rather take the prosecuting attorney a confession. So the only way I'm going to get a confession is if I have the opportunity to interview the suspect." Evid. Hrng. Tr. II (Doc. 36), p. 42. The day after Holloman was taken into custody, he was transported to police headquarters to be interviewed by Det. Swinton. Following that interview, Holloman's statement was used as part of an application for a warrant for statutory rape.

### B.  APRIL 2017 FIREARMS INVESTIGATION OF HOLLOMAN

On April 5, 2017, Detective Bradford Ellis ("Det. Ellis"), an eleven year veteran of the St. Louis Metropolitan Police Department ("SLMPD"), received a tip from a confidential source that Holloman was a convicted felon who was known to be in possession of a firearm. The confidential source gave Det. Ellis a description of Holloman, provided his date of birth, and advised that Holloman was "staying in the [Cupples Station Lofts] with an unknown black female." Evid. Hrng. Tr. I (Doc. 31), pp. 7-8. Det. Ellis did not determine whether the tip was based on personal knowledge. In fact, Det. Ellis acknowledged that the tip from the confidential source was no different than an anonymous tip he might receive through Crime Stoppers. *Id.* at 25-27.

Based on the tip, Det. Ellis initiated a firearms investigation into Holloman. Specifically, Det. Ellis contacted the "realtime crime center," which ran Holloman's name through a certain

5

computer database. Det. Ellis also obtained a photograph of Holloman from the Missouri State Highway Patrol and ran Holloman's name through the SLMPD's LE web system. Based on his investigation, Det. Ellis learned that Holloman had been "arrested" for Violation of Missouri Controlled Substance Law, Unlawful Use of a Weapon, and robbery "within several different states." Det. Ellis also learned that Holloman was "wanted" by the SLMPD Sex Crimes Unit for statutory rape second. *Id.* at 7-8.

Det. Ellis contacted Det. Swinton to confirm that the "wanted" she had entered in October 2016 was still active. Det. Swinton confirmed that it was still active but did not discuss the details of her investigation with Det. Ellis, and Det. Ellis did not share facts about his investigation with Det. Swinton. Using the photograph he obtained from the Missouri State Highway Patrol, Det. Ellis confirmed Holloman's identity by showing the photograph to the confidential source.

### C.  APRIL 20, 2017, ARREST OF HOLLOMAN

On April 20, 2017, Det. Ellis set up surveillance near the Cupples Station Lofts (the "Lofts"), the location where the tipster indicated Holloman was staying. Det. Ellis and two or more officers set up surveillance around 4:00 p.m. Around 4:30 p.m., Det. Ellis observed Holloman walking on the sidewalk toward the front door of the Lofts. Det. Ellis got out of his unmarked police car and approached Holloman with his gun drawn. He identified himself as police and ordered Holloman to show his hands and get down on the ground. Holloman complied. Det. Ellis handcuffed Holloman and searched him. Det. Ellis found no weapons on Holloman but seized a wallet and a single loose key found on Holloman's person during the search. Officers later determined that the key they seized was the front door key for the Loft

apartment they eventually searched; however, the key did not open the exterior door of the Lofts building.

Det. Ellis placed Holloman in his police car and advised Holloman that he was "under arrest and that he had an active warrant for statutory rape second." Evid. Hrng. Tr. I (Doc. 31), p. 10. Reading from a card he carries with him, Det. Ellis advised Holloman of his *Miranda* rights. *Id.* at pp. 10-11. Det. Ellis acknowledged that the purposes of the "wanted" would have been satisfied if, after taking Holloman into custody, he had immediately taken him to the Justice Center for questioning by the Sex Crimes Unit or Det. Swinton. *Id.* at p. 50. However, Det. Swinton was not present at the time Holloman was taken into custody and there is no evidence to suggest that she had prior knowledge either of Det. Ellis' surveillance on April 20th or of Holloman's arrest. Det. Ellis did not immediately transport Holloman to the Justice Center, nor did he contact Det. Swinton to notify her that he had detained Holloman. Instead, Det. Ellis immediately proceeded to explain to Holloman that he was investigating allegations that Holloman was in possession of a firearm, and asked Holloman if he had any firearms or anything illegal in the apartment where he was staying. Evid. Hrng. Tr. I (Doc. 31), pp. 11-12.

### D.  SEARCH OF THE LOFT APARTMENT

Det. Ellis testified that Holloman denied having anything illegal in the apartment. Holloman told the detective he was "getting off work, he was going up to the loft to take a shower, change clothes and go to his son's baseball game;" thereby verifying for Det. Ellis the informant's statement that Holloman was staying at the Lofts. *Id.* Det. Ellis's initial testimony gave the impression that, almost immediately after being asked to search the apartment, Holloman consented to the search:

Q.    So he's in the back of the car for a couple minutes. And then at some point you decide to seek consent from him to search the apartment?

A.    Yes, I explained to him my investigation as far as him being in possession of narcotics and firearms.

. . .

Q.    And what's that conversation like? What are you telling him in order to secure this consent?

A.    Basically I'm telling him my investigation as far as him being in possession of a firearm. And I was asking did he have any illegal items in the loft.

Q.    And what was his response?

A.    He told me he didn't.

. . .

Q.    Okay. And so you're in the police car, you're explaining to him your investigation, that you had evidence or that you had information that he had been seen with a gun, you asked him if he has any contraband or things inside the apartment he's not supposed to have, and he says no?

A.    Yes.

Q.    And then what happens?

A.    At that time he agreed to go upstairs and let us in and sign the consent.

Evid. Hrng. Tr. I (Doc. 31), pp. 33-35.

Later, however, Det. Ellis acknowledged that Holloman did not consent right away.

Instead, Det. Ellis testified that he actually spent approximately five minutes trying to persuade

Holloman to permit the officers to search his girlfriend's apartment:

Q.    So you asked for consent and he just very willingly and voluntarily gave it pretty quickly without a whole lot of conversation?

A.    No, I didn't have to—he didn't do it right away. I kept, you know, talking to him and saying, hey, man, if you don't have anything in there, you know, you shouldn't have a problem with us going upstairs, you know, but never threatened him or anything.

Q.    What other kind of stuff were you saying?

A.    That's pretty much it.

Q.    Just that over and over again?

A.    Yeah, basically.

. . .

8

> Q.    You were talking about the five-minute conversation
>       that you had in the car about getting his consent. What was
>       his reluctance?
> A.    Basically he knew he had a firearm in the loft so he really didn't
>       want me to go up there.
> . . .
>
> Q.    What was the expressed reluctance to you? What did he
>       say to you as his reason for not consenting to the search?
> A.    Basically that he was telling me there was nothing up
>       there so there was no need to search it.
> Q.    And that's all?
> A.    Yes. That's all I can remember at this time.

Evid. Hrng. Tr. I (Doc. 31), pp. 45 & 51-52.

Det. Ellis's testimony on this point is not entirely credible, particularly when considering the detective's body language and demeanor while testifying and the circumstances under which consent was sought. Specifically, at the time Det. Ellis sought consent to search the apartment, Holloman was already in custody and handcuffed in the back of a police car. He had been advised that he was under arrest on a "warrant" for statutory rape. Holloman did not have a key to the building's exterior door and expressed reluctance when asked by police to consent to a search of the apartment. It is not at all clear from Det. Ellis's testimony what, if anything, prompted Holloman's change of heart. Why would Holloman, who had already been advised he was "under arrest" on a statutory rape warrant, suddenly agree to a search that could only land him in deeper trouble?

Further doubt is cast on the credibility of Det. Ellis's account of Holloman's verbal consent to search when Det. Ellis's conflicting testimony regarding Holloman's execution of the consent-to-search form is considered. Det. Ellis testified, consistent with this police report, that he established surveillance around 4:00 p.m., but first observed and encountered Holloman around 4:30 p.m. Evid. Hrng. Tr. I (Doc. 31), p. 9 & 29. Based on that timeline, Det. Ellis

9

testified that it was probably about 4:45 p.m. when Holloman signed the consent form. *Id.* at p. 36. However, the consent-to-search form reflects that it was signed at 4:00 p.m. (1600 hours), a time Det. Ellis had to acknowledge would have been ***before*** he first encountered Holloman. *Id.* at p. 36-37; Govt. Ex. 1.

Det. Ellis's explanation for this discrepancy is confusing, at best:

Q.   So on this form right here, this line where it says time, you interpret that to mean the time your investigation began?
A.   Yes, the time on the consent is usually not the time that, okay, this is the time that he signed. Sometimes it's the time of the – the time that the dispatcher gives us the complaint number. Sometimes it's the time we actually start the investigation. So the time, it varies.
Q.   Is the purpose of putting the time on the form right underneath the date and right above the defendant's signature not to further corroborate and memorialize the timeline of when these things happened?
A.   I'm not sure, ma'am.
Q.   What you're saying doesn't make logical sense, and I'm trying to figure out if this is pursuant to some training, because it also sounds like you're giving sort of inconsistent answers, like sometimes it's this and sometimes it's this. Is there a particular way that you're trained to do this where you're told to do it a certain way or did everyone kind of—
A.   Everybody pretty much, everybody writes the time down the way they see fit. That 1400 [sic] is the time that I believe was the time that this consent was signed.
Q.   But in your report you say you didn't see Mr. Holloman on the street until 4:30?
A.   That's correct.
Q.   So he signed the consent before you saw him?
A.   No, I signed the consent right there at the kitchen counter with him. I put the time, I put the date.
Q.   And the time that you put is not the current time?
A.   No.

Evid. Hrng. Tr. I (Doc. 31), pp. 37-38.

In sum, while it appears plausible that Holloman may have signed the written consent-to-search form presented in this case, the undersigned is unable to accept as fully credible Det. Ellis's account of the events leading up to Holloman's execution of the consent-to-search form.

10

The evidence presented establishes that Det. Ellis and the other officers gained access to the Lofts by waiting until someone was coming out of the Lofts' locked exterior door. The officers took Holloman up to the apartment where Holloman told them he had been staying, and they gained access to the apartment by using the key that had been seized during the search of Holloman. Det. Ellis testified that once they were inside the apartment, Holloman signed a consent-to-search form.  *See* Govt. Ex. 1.

Det. Ellis further testified that, almost immediately after signing the consent-to-search form, Holloman advised him that there was a firearm on top of the refrigerator which was not far from where the two were standing. Det. Ellis seized the firearm and placed Holloman under arrest a second time—this time for unlawful possession of a firearm. Det. Ellis repeated the *Miranda* warning to Holloman and then transported him to the St. Louis City Justice Center, where Holloman gave a recorded statement after being advised (once again) of his *Miranda* rights.  The undersigned has no reason to question the credibility of this aspect of the detective's testimony.

## II.  CONCLUSIONS OF LAW

The Fourth Amendment protects people against unreasonable government seizures. U.S. Const. amend. IV ("[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated"). For Fourth Amendment purposes, a seizure occurs whenever an officer restrains an individual's liberty by physical force or a show of authority to which the individual submits. *California v. Hodari D.*, 499 U.S. 621, 626 (1991). If unreasonable under the circumstances, such seizures violate the Fourth Amendment.

There are essentially two types of seizures that implicate the Fourth Amendment:

traditional arrests and investigatory stops. The arrest of a person is "quintessentially a seizure" required by the Fourth Amendment to be reasonable. *United States v. Watson,* 423 U.S. 411, 428 (1976) (Powell, J., concurring). If made pursuant to a warrant issued by a detached and neutral judge, an arrest is deemed to be presumptively reasonable. *See United States v. Leon,* 468 U.S. 897, 922 (1984) ("a warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith;" as such "[s]earches [or seizures] pursuant to a warrant will rarely require any deep inquiry into reasonableness"). *See also Payton v. New York,* 445 U.S. 573, 602 (1980) (an arrest warrant "interpose[s] the magistrate's determination of probable cause between the zealous officer and the citizen"). An officer may conduct a warrantless arrest without violating the Fourth Amendment if the officer has probable cause to believe the arrestee has committed a felony and the arrest occurs in a public place. *See Watson,* 423 U.S. at 423-24.

In *Terry v. Ohio,* 392 U.S. 1, 28-31 (1968), the Supreme Court held that investigatory stops— i.e., brief seizures by police that fall short of traditional arrests—are also reasonable and lawful if justified by a reasonable suspicion that an individual is engaged in criminal activity and if police activities during the investigatory stop are reasonably related to the circumstances that initially justified the stop. *See also Rodriguez v. United States,* 135 S. Ct. 1609, 1615 (2015). "Reasonable suspicion requires that the officers' suspicion be based upon particularized objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime has been committed." *United States v. Smith,* 648 F.3d 654, 658 (8th Cir. 2011) (internal citations omitted). An "inchoate and unparticularized suspicion or hunch" is insufficient. *Terry,* 392 U.S. at 27 (internal quotation marks omitted). In determining whether the requisite degree of suspicion exists, the court must determine whether the facts

collectively establish reasonable suspicion and not whether each particular fact establishes reasonable suspicion—the whole picture, i.e., the "totality of the circumstances" must be taken into account. *See United States v. Linkous*, 285 F.3d 716, 720 (8th Cir. 2002); *United States v. Jones*, 269 F.3d 919, 927 (8th Cir. 2001). The court may consider any added meaning that certain conduct might suggest to experienced officers in the field, but the officer's reasonable suspicion cannot be "just a mere hunch or based on circumstances which 'describe a very large category of presumably innocent [people].'" *Jones,* 269 F.3d at 927 (quoting *Reid v. Georgia,* 448 U.S. 428, 441 (1980)).

In *United States v. Hensley,* 469 U.S. 221, 232 (1985), the Supreme Court held that, when making an investigatory *Terry* stop, police officers may rely upon notice from another police department that a person is wanted in connection with the investigation of a felony, even if the notice omits the specific articulable facts supporting reasonable suspicion. *See also Smith,* 648 F.3d at 659. "[I]f a flyer or bulletin has been issued on the basis of articulable facts supporting a reasonable suspicion that the wanted person has committed an offense, then reliance on that flyer or bulletin justifies a stop to check identification, to pose questions to the person, or to detain the person briefly while attempting to obtain further information." *Hensley,* 469 U.S. at 232 (internal citations omitted). *Accord Smith,* 648 F.3d. at 659 (quoting *Hensley,* 469 U.S. at 232)*.*

In conducting an investigatory *Terry*-type stop, "[o]fficers must 'use the least intrusive means of detention and investigation, in terms of scope and duration, that are reasonably necessary to achieve the purpose of the *Terry* stop.'" *United States v. Newell,* 596 F.3d 876, 879 (8th Cir. 2010) (quoting *Terry,* 392 U.S. at 25-31). Where police exceed the permissible scope articulated in *Terry*, the investigatory detention is transformed into an arrest that must be supported by probable cause. *United States v. Aquino*, 674 F.3d 918, 924 (8th Cir. 2012). For

example, a *Terry* stop may become an arrest, requiring probable cause, "if the stop lasts for an unreasonably long time or if officers use unreasonable force." *Newell,* 596 F.3d at 879.

However, officers may, without converting an investigatory *Terry* stop into an arrest, take any measures that are "reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." *Id.* (quoting *Hensley,* 469 U.S. at 235). "[W]hen officers are presented with serious danger in the course of carrying out an investigative detention, they may brandish weapons or even constrain the suspect with handcuffs in order to control the scene and protect their safety." *Smith,* 648 F.3d at 654 (quoting *United States v. Fisher,* 364 F.3d 970, 973 (8th Cir. 2004)). *See also United States v. Danielson,* 728 F.2d 1143, 1146-47 (8th Cir.1984) (concluding investigatory detention did not become an arrest when the officers drew their weapons before approaching the vehicle occupied by suspected armed bank robbers).

In determining whether an investigatory *Terry* stop has become an arrest, courts consider the diligence of police in resolving their reasonable suspicion as quickly as possible; the scope and nature of the restraints placed on the individual's liberty; and whether police transported the individual to another location. *See United States v. Sharpe,* 470 U.S. 675, 686 (1985) (considering whether police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly in determining whether investigatory stop became an arrest); *Hayes v. Florida*, 470 U.S. 811, 816 (1985) (stop converted to arrest when officers removed defendant from his home and transported him to police station where he was briefly detained for investigative purposes); *Florida v. Royer,* 460 U.S. 491, 502-03 (1983) (stop converted to arrest because officers moved detainee from airport concourse to a small room); *Aquino,* 674 F.3d at 925-27 (permissible limits of *Terry* were exceeded converting stop into an

14

arrest where, after handcuffing defendant, officer immediately performed a more intrusive search by lifting defendant's pant leg to examine his leg underneath his clothing and search was not least intrusive means necessary to protect officer safety); *United States v. Maltais*, 403 F.3d 550, 555-57 (8th Cir. 2005) (investigatory detention lasting nearly three hours was not transformed into an arrest where officers were diligently pursuing their investigation and detention occurred in a remote location at 1 a.m.)

An investigatory *Terry* stop that becomes an arrest must be supported by probable cause. *Aquino*, 674 F.3d at 924. "Probable cause for an arrest exists if, at the moment the arrest was made, the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent person in believing that an offense has been committed." *United States v. Rivera*, 370 F.3d 730, 733 (8th Cir. 2004) (citing *United States v. Wajda,* 810 F.2d 754, 758 (8th Cir. 1987)). The Supreme Court has recognized that because "[a]n arrest without a warrant bypasses the safeguards provided by an objective predetermination of probable cause, and substitutes instead the far less reliable procedure of an after-the-event justification for the arrest," the requirements of reliability and particularity of the information on which an officer arresting without a warrant may act "'cannot be less stringent than where an arrest warrant is obtained. Otherwise, a principal incentive now existing for the procurement of arrest warrants would be destroyed.'" *Beck v. Ohio,* 379 U.S. 89, 96 (1964) (quoting *Wong Sun v. United States,* 371 U.S. 471, 479-80 (1963)).

These principles make clear that, ordinarily, the arresting officer's personal knowledge about the facts and circumstances for a warrantless arrest is a necessary first step in satisfying the Fourth Amendment's reasonableness requirement. Indeed, the Supreme Court has held that the principal components of a probable cause determination are (1) a determination of the historical

facts—i.e., what were the events leading up to the stop and (2) whether the historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause. *Ornelas v. United States,* 517 U.S. 690, 696 (1997).

However, the Eighth Circuit has held that when "multiple officers are involved in an investigation, probable cause may be based on their collective knowledge and need not be based solely on the information within the knowledge of the arresting officer as long as there is some degree of communication" between the members of the investigative team.    *United States v. Robinson,* 664 F.3d 701, 703 (8th Cir. 2011) (citing cases). The collective knowledge doctrine typically applies where an officer with personal knowledge of incriminating facts is an active participant in the search or seizure at issue and/or exchanges substantive incriminating information with a less informed officer who conducts the search or seizure. *See, e.g., Robinson,* 664 F.3d at 703-704 (doctrine applied where detective with personal knowledge tailed suspect, observed traffic violations that gave rise to probable cause for a stop, directed patrolman with no personal knowledge of facts to stop the suspect's car, and was present at the time the car was stopped); *United States v. Frasher,* 632 F.3d 450, 452-53 (8th Cir. 2011) (doctrine applied where officer who witnessed traffic violation communicated what he observed to another officer, directed officer to make a traffic stop, and showed up at scene ten minutes after the stop); *United States v. Banks,* 514 F.3d 769, 776 (8th Cir. 2008) (doctrine applied where officers conducting separate investigations were exchanging information and communicating with each other regarding their respective investigations and officers from both investigations were present at the seizure); *United States v. Stratton,* 453 F.2d 36, 37 (8th Cir. 1972) (probable cause for arrest existed where collective information available to all Secret Service agents participating in the arrest was sufficient to establish probable cause to believe defendant was passing counterfeit

notes where officers were working in close concert with each other).

The doctrine is intended to allow officers to work as a single investigative team without requiring each member of the team to know every fact pertinent to the team's actions, by imputing the knowledge of one member of the team to all members of the team. *See Stratton,* 453 F.2d at 37. Read together, the collective knowledge cases stand for the proposition that, so long as the officer or officers with personal knowledge are actively involved in the search or seizure and there has been an exchange of information or instructions by an officer with personal knowledge, the Fourth Amendment's reasonableness requirement is satisfied if the collective information available to all officers participating in the arrest or search is sufficient to establish probable cause for the arrest or search. However, these cases also suggest that where officers are not "functioning as a team" but instead are "acting as independent actors who merely happen to be investigating the same subject," it would be unreasonable under the Fourth Amendment to consider as "collective knowledge" information known to officers acting independently. *See Robinson,* 664 F.3d at 704 (holding that the reason for requiring that there be "some degree of communication" between officers is so that courts can "distinguish between officers functioning as a search team" and officers acting independently).

### A.  THE INITIAL DETENTION OF HOLLOMAN WAS VALID BECAUSE POLICE HAD REASONABLE SUSPICION TO CONDUCT AN INVESTIGATORY STOP

Based on the foregoing factual findings, Holloman was first seized for Fourth Amendment purposes when he complied with Det. Ellis's directives to show his hands and get down on the ground. *See Hodari D.*, 499 U.S. at 626 (seizure occurs whenever an officer restrains an individual's liberty by physical force or a show of authority to which the individual submits); *United States v. Hayden,* 759 F.3d 842, 847 (8th Cir. 2014) (defendant seized when he complied with officer's directive to remove his hand from his jacket pocket). This seizure did not

17

violate the Fourth Amendment because police had reasonable suspicion to conduct an investigatory stop of Holloman.

Although Det. Ellis did not have personal knowledge of the facts underlying the "wanted" bulletin issued by Det. Swinton, he was aware that Holloman was "wanted" for questioning in connection with suspected statutory rape. Under *Hensley,* so long as the officer who issued the wanted bulletin had reasonable suspicion that the wanted person has committed an offense, then "reliance on that flyer or bulletin justifies a stop to check identification, to pose questions to the person, or to detain the person briefly while attempting to obtain further information." *Hensley,* 469 U.S. at 232.

The evidence presented demonstrates that Det. Swinton had reasonable suspicion to believe Holloman had committed statutory rape when she entered the "wanted." By the time she entered the "wanted," Det. Swinton had participated in multiple interviews, including interviews with the victim, the victim's mother and the principal of the school the victim attended. She had also reviewed hotel surveillance video footage that confirmed that Holloman was present at the hotel on the night of the alleged sexual contact. This information, coupled with Det. Swinton's interactions with and firsthand observations of the victim and other witnesses, was sufficient to support an investigatory stop based on reasonable suspicion that Holloman had committed statutory rape second. Because Det. Swinton had reasonable suspicion that Holloman had committed statutory rape when she issued the "wanted," Det. Ellis did not violate the Fourth Amendment when he seized Holloman in reliance on the "wanted."

In addition to the "wanted" bulletin, Det. Ellis also had information from an informant that Holloman was a convicted felon who was known to be in possession of a gun. However, the facts known to Det. Ellis about the suspected gun offense were not sufficient to justify an

investigatory stop of Holloman. Based on the foregoing factual findings, the tipster's information was not based on first hand observations and provided only a generic description of Holloman and his whereabouts. Based on Det. Ellis's testimony, when he ran Holloman's name through the police database his search revealed that Holloman had been arrested for, but not necessarily convicted of, several crimes, including gun-related offenses. As such, it does not appear that Det. Ellis corroborated critical information, including the tip that Holloman had felony convictions. Although a reliable tip from an informant could constitute reasonable suspicion sufficient to justify an investigatory stop, when the tip comes from an informant of unknown or uncertain reliability, police need greater corroboration to justify taking action based on such a tip. *Compare Alabama v. White,* 496 U.S. 325, 330-32 (1990) (corroboration of anonymous tip by police surveillance provided reasonable suspicion for a stop), *with United States v. Brown,* 401 F.3d 588, 596 (4th Cir. 2005) (no reasonable suspicion where anonymous tipster provided only brief description of suspect, his whereabouts, and uncorroborated allegation he was carrying a firearm).

As such, the initial seizure of Holloman would likely have violated the Fourth Amendment if the only facts known to Det. Ellis and the other officers were those related to the suspected felon in possession offense. However, because Det. Ellis also knew that Holloman was "wanted" for suspected statutory rape second, and because Det. Swinton had reasonable suspicion to issue the "wanted," Det. Ellis could, without violating the Fourth Amendment, stop Holloman to check identification,  pose questions, or detain him briefly while attempting to obtain further information. *Hensley,* 469 U.S. at 232.

Det. Ellis's decision to approach Holloman with his gun drawn, order Holloman to show his hands and get on the ground, and handcuff Holloman did not necessarily convert the stop into

19

an arrest. At the point he encountered Holloman, the information known by Det. Ellis, albeit unverified, was that Holloman was a convicted felon who carried a weapon. Det. Ellis had also reviewed Holloman's criminal history, which included prior arrests (without conviction) for gun-related offenses. Based on the facts known by Det. Ellis when he first encountered Holloman, it was not unreasonable for Det. Ellis to take the protective steps of showing his weapon, ordering Holloman to show his hands and get on the ground, and handcuffing Holloman. Det. Ellis's use of these protective measures did not convert what was otherwise an investigatory stop into an arrest. *See Newell,* 596 F.3d at 879.

In sum, because police had reasonable suspicion to conduct an investigatory stop, Holloman's Fourth Amendment rights were not violated when officers first seized him. [1]

### B.  THE INVESTIGATORY STOP EVOLVED INTO AN ARREST

The evidence of record demonstrates that, for at least two reasons, the investigatory stop became a de facto arrest soon after Holloman was handcuffed. First, Det. Ellis did not use the "least intrusive means of detention and investigation, in terms of scope and duration, that are reasonably necessary to achieve the purpose of the *Terry* stop." *Newell,* 596 F.3d at 879. For example, Det. Ellis did not merely conduct a protective pat down frisk for weapons, which would have been permissible under *Terry*; he conducted a search of Holloman's person and seized his wallet and a key. The United States has failed to point to any evidence that would justify this intrusion. *See Aquino,* 674 F.3d at 926-27 (in the absence of any justification for by-passing a pat down search, investigatory stop was converted into an arrest when police performed more intrusive search by lifting defendant's pant leg to search for a weapon).

---

[1] The United States has never contended in this case that Holloman's detention was anything short of a traditional arrest. However, the undersigned has considered whether the facts show that Holloman's detention was an arrest or an investigatory stop.

In addition, although the search revealed no weapons or other contraband, Det. Ellis placed Holloman, still handcuffed, in the back seat of the police car, gave a *Miranda* warning, and then advised Holloman that he was "under arrest and that he had an active warrant for statutory rape second." Det. Ellis then detained Holloman at the scene to question him about being a suspected felon in possession of a firearm and to attempt to obtain Holloman's consent to search his girlfriend's apartment. By advising Holloman that he was "under arrest" based on an "active warrant for statutory rape" and detaining him at the scene to further a separate investigation, police exceeded the permissible scope articulated in *Terry* and *Hensley. See Terry,* 392 U.S. at 28-31 (police activities during the investigatory stop must be reasonably related to the circumstances that initially justified the stop); *Hensley,* 469 U.S. at 232 (police making a stop in reliance on a wanted bulletin can check identification, pose questions to the person, or detain the person briefly while attempting to obtain further information).

Second, the evidence presented demonstrates that Det. Ellis was not diligent in attempting to dispel or confirm any reasonable suspicion there might have been to justify the initial stop—i.e., suspected statutory rape. Instead, Det. Ellis immediately pivoted to his gun investigation—suspected criminal activity for which he lacked reasonable suspicion to conduct an investigatory stop. In other words, the evidence demonstrates that although Det. Ellis ostensibly "arrested" Holloman for suspected statutory rape, he detained Holloman at the scene so that he could further his separate gun investigation. Detaining a suspect for the sole purpose of enabling authorities to interrogate the suspect about other possible crimes, as Det. Ellis did here, is a practice the Eighth Circuit has found to be "objectionable" and violative of the Fourth Amendment. *United States v. Davis,* 174 F.3d 941, 946 (8th Cir. 1999).

In sum, based on the evidence presented, and, for all of the foregoing reasons, what might

have started as an investigatory detention quickly became an arrest that was valid only if it was supported by probable cause.

### C.  DET. ELLIS DID NOT HAVE PROBABLE CAUSE TO ARREST HOLLOMAN

The evidence presented fails to establish that either Det. Ellis, individually, or the team of officers participating in the arrest, collectively, had probable cause to arrest Holloman. The facts and circumstances known to Det. Ellis at the time of Holloman's arrest were confined chiefly to information he obtained from the tipster regarding a suspected gun offense. Those facts, which consisted of largely uncorroborated statements from a tipster of unknown reliability, are not sufficient to support a finding of probable cause. Indeed, the United States has made no pretense in this case that, when he first arrested Holloman, Det. Ellis had probable cause to arrest based on what he knew about the suspected gun offense.

Neither Det. Ellis, as the arresting officer, nor any of the other members of his team had any knowledge of the historical facts underlying the suspected statutory rape charge that was the subject of the "wanted" bulletin. All Det. Ellis knew about the statutory rape investigation was that, six months earlier, Det. Swinton had issued a bulletin indicating that Holloman was wanted for questioning about suspected statutory rape. Det. Ellis also knew the "wanted" was still active. It seems highly unlikely that a detached and neutral judge would issue a warrant based on the scant facts that were known to Det. Ellis when he arrested Holloman. *See Beck,* 379 U.S. at 96 (holding that the requirements of reliability and particularity a court requires when an officer has made an arrest without a warrant cannot be less stringent than what the court would require when a warrant is obtained).

### 1.  *Det. Ellis could not arrest Holloman based solely on the "wanted" bulletin.*

Citing *Hensley* as support, the United States contends the "wanted" bulletin authorized

22

Det. Ellis to arrest Holloman because, at least in Det. Swinton's opinion, Det. Swinton had probable cause to support an arrest when she entered the "wanted" for statutory rape. This argument lacks merit for several reasons. First, it should go without saying that the ***wanted*** entered by Det. Swinton is not a ***warrant***. As it was explained at the evidentiary hearing, the "wanted" entered by Det. Swinton is "basically what detectives put out for an individual who is suspected of doing a crime." *See* Evid. Hrng. Tr. I (Doc. 31), p. 19. To enter someone as "wanted" in the police database, St. Louis Metropolitan police do not need to go to a neutral judge for authorization; instead, the officer gets approval to enter the "wanted" from his or her sergeant. *Id.* at p. 20. An arrest warrant, on the other hand, protects an individual from unreasonable seizure by interposing a neutral judge's determination "between the zealous officer and the citizen." *Payton v. New York,* 445 U.S. 573, 602 (1980) (Powell, J., concurring). Even assuming for the moment that Det. Swinton had probable cause to arrest when she entered the "wanted," permitting what is urged here by the United States would seem to go a long way to eroding a fundamental purpose underlying the warrant requirement.

Second, the United States cannot avail itself of *Hensley*. Admittedly, *Hensley* held that an officer without personal knowledge of the underlying facts may rely on a "wanted" bulletin to conduct an investigatory *Terry*-type stop. *Hensley*, 469 U.S. at 230-233. However, the Supreme Court was careful to point out that its holding in *Hensley* did not authorize police to rely on a "wanted" bulletin to justify a longer or more intrusive detention such as an arrest:

> To be sure, the St. Bernard flyer at issue did not request that other police departments briefly detain Hensley merely to check his identification or confirm the existence of a warrant. Instead, it asked other departments to pick up and hold Hensley for St. Bernard. ***Our decision today does not suggest that such a detention, whether at the scene or at the Covington police headquarters, would have been justified. . . . . Nor do we mean to endorse St. Bernard's request in its flyer for actions that could forseeably violate the Fourth Amendment***.

*Id.* at 235 (emphasis added)(internal citations omitted). *See also Hayes v. Florida*, 470 U.S. at 816 (noting the limitations of its holding in *Hensley*).

Finally, although Det. Swinton may have had reasonable suspicion to believe Holloman committed the crime of statutory rape when she entered the "wanted," the evidence of record does not support a finding that she also had probable cause. Detention under *Hensley* was authorized only if the person who entered the "wanted" had the requisite knowledge that the defendant had engaged in criminal activity. *Hensley,* 469 U.S. at 232. As the foregoing factual findings demonstrate, there was a lot Det. Swinton was unable to corroborate. She was unable to corroborate the victim's statements that she and Holloman had been communicating via phone and Facebook messenger for some time before the sexual encounter; unable to corroborate the sexual encounter with physical/DNA evidence; and unable to corroborate with video surveillance footage or witness statements that Holloman and the victim were ever together on the night of the alleged encounter. The conclusion that Det. Swinton lacked probable cause is further bolstered by evidence in the record that Det. Swinton did not even attempt to obtain a warrant until, six months after entering the "wanted," Holloman made a confession after he was arrested by Det. Ellis.

The undersigned acknowledges that it is entirely possible that, even without Holloman's statement, Det. Swinton might have persuaded a neutral judge that she had probable cause for an arrest. Such a result is both possible and plausible because, unlike Det. Ellis, Det. Swinton was armed with firsthand observations of the various witnesses she interviewed and evidence she reviewed. Presumably, she could have supplied those details in support of an arrest warrant. However, Det. Swinton did not provide such details in her hearing testimony, and this Court is confined to the record before it when determining whether Det. Swinton did or did not have

24

probable cause to arrest Holloman at the time she entered the "wanted." For the reasons set out above, the evidence presented in this case is not sufficient to support a finding that there was probable cause to arrest Holloman when Det. Swinton entered the "wanted." In sum, even if *Hensley* authorized an officer to make an arrest based on a "wanted" that was supported by probable cause and entered by another officer, as the United States suggests, there is insufficient evidence in the record to support a finding that the "wanted" bulletin in this case was supported by probable cause.

Finally, notwithstanding the United States' arguments to the contrary, the United States cannot avail itself of the Supreme Court's decision in *United States v. Watson,* 423 U.S. 411 (1975), or the Missouri Court of Appeals' decision in *Missouri v. Pate,* 469 S.W.3d 904 (Mo. Ct. App. 2015). *Watson* does not authorize police to rely on "wanted" bulletins in making warrantless arrests. The central holding in *Watson* is that an agent with probable cause to make a warrantless arrest may do so even absent exigent circumstances. *Watson,* 423 U.S. at 421-424.

Although *Missouri v. Pate* appears to support the United States' position, because it is a decision by the Missouri Court of Appeals, it is not binding on this Court. Perhaps more significantly, the court in *Pate* erroneously concluded that *Hensley* authorized a full custodial arrest based on a "wanted" bulletin when, as previously discussed, *Hensley* permits police to rely on "wanted" bulletins only when conducting a *Terry*-type investigatory stop. *See Pate,* 469 S.W.3d at 910-911 (citing *Hensley* for the proposition that "[r]adio bulletins, telephone calls, computer records, and police flyers have all been upheld as permissible means of authorizing officers to ***arrest*** so long as the individual officer disseminating the information had probable cause to ***arrest*** at that time.") (emphasis added). Finally, *Pate* is at odds with Eighth Circuit precedent discussed above to the extent it suggests that the court may apply the collective

knowledge theory even in the absence of substantive communication between officers who are separately investigating the same individual.

### 2.  *The collective knowledge doctrine does not apply.*

The United States contends that in determining whether there was probable cause for Holloman's arrest, this Court should impute Det. Swinton's knowledge to Det. Ellis and the other arresting officers. However, as set out above, it is not at all clear that, based on the evidence presented, the facts within Det. Swinton's knowledge prior to Holloman's arrest would have been sufficient to support a finding of probable cause. Even assuming the facts known to Det. Swinton were sufficient to support a finding of probable cause for an arrest, the collective knowledge doctrine does not apply because there is no evidence that Detectives Swinton and Ellis were functioning as a team at the time of Holloman's arrest. Specifically, the evidence presented at the hearing shows that Det. Swinton began and essentially completed her statutory rape investigation approximately six months before Det. Ellis began his gun investigation. Although Det. Ellis contacted Det. Swinton to confirm that the "wanted" was still active, there is no evidence to suggest that Det. Ellis either requested or received any of the details of the statutory rape investigation. Nor is there evidence to suggest that Det. Ellis and Det. Swinton were sharing information or collaborating with each other in their respective investigations. Det. Swinton was not part of the team that arrested Holloman, and there is no evidence that Det. Swinton was even aware of the arrest until after it happened. In sum, the collective knowledge doctrine does not apply because, based on the facts of this case, Det. Ellis and Det. Swinton were not "functioning as a team"; rather, they were "acting as independent actors who merely happen[ed] to be investigating the same subject." *Robinson,* 664 F.3d at 704.

For all of the foregoing reasons, Holloman's Fourth Amendment rights were violated

once the initial stop was transformed into a de facto arrest because the arrest was not supported by probable cause.

### D.  THE FIREARM AND HOLLOMAN'S STATEMENTS MUST BE SUPPRESSED

Under the exclusionary rule, evidence obtained in violation of the Fourth Amendment may not be introduced at trial to prove a defendant's guilt. *Elkins v. United States,* 364 U.S. 206, 223-24 (1960) (evidence obtained as the result of an unreasonable search and seizure by state officers cannot be used against defendant in federal court). The purpose of the exclusionary rule is to deter constitutional violations. *See Leon,* 468 U.S. at 906. A court may admit evidence that would not have been discovered but for official misconduct only if the causal connection between the illegal conduct and the acquisition of the evidence is sufficiently attenuated to purge the evidence of its initial taint. *See Wong Sun v. United States,* 371 U.S. 471, 487-88 (1963); *Brown v. Illinois,* 422 U.S. 590, 603-04 (1975) (holding that in determining whether the causal chain has been sufficiently attenuated courts should consider how much time elapsed between the illegality and the acquisition of the evidence, the presence of intervening circumstances, and the purpose and flagrancy of the official conduct). The exclusionary rule applies to verbal statements obtained as a result of official misconduct as well as to the more traditional seizure of physical evidence. *United States v. Yousif,* 308 F.3d 820, 832 (8th Cir. 2002) ("Verbal statements obtained as a result of a Fourth Amendment violation are as much subject to the exclusionary rule as are items of physical evidence discovered during an illegal search.").

In addition, evidence seized pursuant to an allegedly consensual search following an invalid or illegal seizure must be suppressed under the "fruit of the poisonous tree" doctrine unless the consent was sufficient to purge the taint of the unlawful seizure. *Royer,* 460 U.S. at 507-508; *United States v. Alvarez-Manzo,* 570 F.3d 1070, 1077 (8th Cir. 2009). "[V]oluntary

consent to search, which was preceded by an illegal police action does not automatically purge the taint of an illegal [seizure]." *Alvarez-Manzo,* 570 F.3d at 1078 (quoting *United States v. Esquivel,* 507 F.3d 1154, 1160 (8th Cir.2007)). Rather, to prevent the application of the "fruit of the poisonous tree" doctrine, "the government bears the burden of demonstrating that the voluntary consent was an independent, lawful cause of the search." *Id.* In determining whether this standard is met, the Eighth Circuit applies the following three factors: (1) the temporal proximity between the Fourth Amendment violation and the grant of consent to search; (2) the presence of any intervening circumstances; and (3) the purpose and flagrancy of the officer's Fourth Amendment violation. *Id.* (citing *Brown v. Illinois,* 422 U.S. 590, 603-604 (1975)).

In this case, the United States argues only that Holloman's consent was voluntary. It does not argue or make any attempt to show that Holloman's consent purged the taint of his unlawful arrest. Assuming, without deciding, that Holloman's consent was voluntary, the firearm and any subsequent statement made by Holloman must be suppressed because the United States has failed to demonstrate that the causal connection between the illegal seizure and Holloman's subsequent consent-to-search was broken. [2]

## III.    CONCLUSION

For all of the foregoing reasons, Defendant Michael Holloman's Motion to Suppress Evidence and Statements should be granted.

_Shirley Padmore Mensah_
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 9th day of November, 2017.

---

[2] Based on the foregoing factual findings, the undersigned is doubtful that the United States has demonstrated that consent was voluntary. However, because the United States has failed to demonstrate that the causal connection between the illegal seizure and Holloman's consent was broken, the undersigned does not reach the issue of voluntariness.

28